# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00052-CV

**In the Matter of C. F.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. J-21,405, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

In this case, we decide whether the district court abused its discretion by committing a delinquent juvenile to the Texas Youth Commission ("TYC") instead of putting him on probation and committing him to a residential treatment center. We affirm the order of the district court.

### BACKGROUND

Appellant, C.F., was a fifteen-year-old student receiving special-education services at the Pflugerville Opportunity Center, which is part of an alternative disciplinary center serving students in the Pflugerville Independent School District. The principal of the Center testified that, during the last two years, C.F. had attended classes at the Center for various spans of time, including one eight-month period. C.F. had a long history of emotional and behavioral problems and had been

previously diagnosed with the "handicapping conditions" of emotional disturbance,[1] a writing-specific learning disability, and the "other health impairment" of Attention Deficit Hyperactivity Disorder. As is standard with all of its special-education students, the Center developed a Behavior Implementation Plan ("BIP") outlining strategies to help C.F. behave in an appropriate fashion.[2] In addition, C.F. was taking prescription medication to help control his behavior.

On May 12, 2003, C.F. was in a portable classroom with other students and his teacher, Nicole Urbach. At the end of the school day, but before he had been dismissed, he abruptly left.[3] C.F. had left class without permission on a number of previous occasions.[4] Urbach radioed the other teachers at the Center that they should lock their portable classrooms. She then followed C.F. while he wandered from adjoining classrooms to different portable buildings. When C.F. approached a neighboring classroom, he was blocked at the door by another teacher. He turned

---

[1] According to a report by C.F.'s expert, emotional disturbance is a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects educational performance: (1) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (2) an inability to build or maintain satisfactory relationships with peers and teachers; (3) inappropriate types of behaviors or feelings under normal circumstances; (4) a general pervasive mood of unhappiness or depression; and (5) a tendency to develop physical symptoms or fears associated with personal or school problems.

[2] For example, one of the listed objectives in the BIP was for C.F. to "respond to adult correction appropriately and nondefensively." Among the strategies listed for accomplishing this objective were teaching alternative behaviors, teaching appropriate social skills, setting clear expectations, and "redirecting" in a calm voice.

[3] The Opportunity Center's procedure was to keep students in their classrooms until their transportation home had arrived at the school.

[4] Because of these prior incidents, this wandering behavior was addressed in his BIP.

around, shoved Urbach out of the way, and headed toward another classroom.  Urbach continued to walk by C.F.'s side and attempted to calm him down and get him to return to the classroom.  During these events, C.F. was cursing at Urbach and being verbally abusive.  He shoved Urbach against the wall of a portable classroom.  Urbach testified that she felt pain from being shoved into the wall.  When C.F. reached the next classroom, he found that the door was locked.  He then turned and shoved Urbach a third time.  At this point, Urbach broke off contact and went to the office to contact the principal.[5]

The State filed a petition alleging that C.F. engaged in delinquent conduct by assaulting a public servant.  *See* Tex. Pen. Code Ann. § 22.01(b)(1) (West Supp. 2004-05).  At the adjudication hearing before a juvenile court referee, the Honorable William D. King, several teachers, including Urbach, testified about the facts related above.  Dr. Laura Hamilton, a psychologist, testified on behalf of C.F.  She opined that because Urbach had not given C.F. a "cooling-off" period and "choices to avoid power struggles," the Center had failed to properly implement or follow strategies listed in the BIP during the incident.[6]  She further testified that the BIP was not adequate to meet C.F.'s needs and that the escalation of the incident was a predictable result, given his history.  C.F.'s mother testified that he had not received his medication that

---

[5]  The record is not clear about what happened after Urbach broke off contact with C.F.  Based on testimony, it appears that C.F. remained on the Center campus for at least two more hours.

[6]  Among other opinions, the expert criticized Center teachers for locking their classroom doors because those responses to C.F.'s actions were not explicitly enumerated in the BIP.

3

morning. At the close of the adjudication hearing, however, the referee found that C.F. had engaged in delinquent conduct.

At the subsequent disposition hearing, the State presented evidence that C.F. had thirty-six other referrals to juvenile court and had previously been placed at Pathfinders, a residential treatment center. C.F.'s juvenile probation officer testified that he had been discharged unsuccessfully from the Pathfinders program because of an altercation with facility staff.[7] Citing this previous unsuccessful intervention and the ability of the TYC to provide counseling, therapy, and help with medication maintenance, the probation officer recommended that C.F. be committed to the TYC. Dr. Hamilton again testified on behalf of C.F. and recommended that he be placed in a residential treatment center. She opined that it was unlikely that C.F. would receive the intensive therapeutic treatment, which she asserted he needed, at the TYC and that a residential treatment center would be more beneficial to him. However, Hamilton admitted that she did not know the program options currently offered by the TYC, and did not recommend a specific residential treatment program.

At the close of the disposition hearing, the referee recommended that C.F. be committed to the TYC for an indeterminate period of time. In doing so, the referee summarized the findings of various tests C.F. had taken and considered the testimony that many individuals can improve their behavior as they mature. However, he also noted the finding that "in [C.F.'s] situation

_____

[7] C.F.'s juvenile probation officer testified that the discharge summary from Pathfinders also indicated that while there, C.F. was "verbally aggressive towards fellow residents and staff" and had other incidents where C.F. allegedly "had shoved, pushed, assaulted, or thrown objects at other residents."

this is unlikely without intense treatment due to the severity and long history of his problem." Then,

he explained:

> Treatment that focuses on problem solving, compliance training, and medication therapy should prove to be helpful. People may disagree with this, but I try to think—I do think of myself as someone who gives kids in my court as many chances as I reasonably can to—and fortunately we live in a county—we have a high tax rate but we also—because of that we have a lot of services in this county for kids, and the school districts, I think, are progressive and try to do everything they can for their students, both regular education and special education. But at some point, and this is the point, I've got to figure out what I think is going to work in a reasonable amount of time and a reasonable use of the limited resources we do have, because even though we have some, we don't have an unlimited amount of resource. I cannot justify another placement through county resources for [C.F.]. I think it's going to be a long process. So I'm going to commit [C.F.] to the Texas Youth Commission. We have extensive documentation of his mental health needs and history. They contract with private facilities themselves. They run their own residential treatment facilities as well as a host of other types of programs, but the particularly helpful thing that the TYC can do is keep kids long enough to make a difference. And [C.F.] is certainly an intelligent child, and while there are some obstacles, many people believe that he can change his behavior if in the right place for the right amount of time. And I think TYC is the way to go with that.

The district court signed an order committing C.F. to the TYC for an indeterminate period of time.

This appeal followed.

## DISCUSSION

C.F. brings a single issue on appeal. He argues that the court abused its discretion

by committing him to the TYC instead of putting him on probation and committing him to a

residential treatment center. Specifically, he contends that expert testimony at trial showed that he

5

would benefit from therapy in a residential treatment system, but he was committed to the TYC instead because the court was not willing to devote any more of Travis County's funds to C.F.

**Standard of review**

A juvenile court possesses broad discretion to determine the disposition of a child adjudicated delinquent. *In re C.G.*, No. 05-04-00541-CV, 2005 Tex. App. LEXIS 3705, at *6 (Tex. App.—Dallas May 13, 2005, no pet.); *In re K.J.N.*, 103 S.W.3d 465, 465-66 (Tex. App.—San Antonio 2003, no pet.); *In re J.R.*, 907 S.W.2d 107, 110 (Tex. App.—Austin 1995, no writ). Absent a showing of abuse of discretion, we will not disturb the district court's decision. *In re M.S.*, 940 S.W.2d 789, 791 (Tex. App.—Austin 1997, no writ). A court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *In re K.K.D.*, No. 03-03-00702-CV, 2004 Tex. App. LEXIS 7166, at *8 (Tex. App.—Austin August 12, 2004, pet. denied) (mem. op.); *see Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). To determine whether there has been an abuse of discretion, we review the reasons stated by the court to determine whether they are supported by the evidence and are legally and factually sufficient to justify the disposition ordered. *See In re J.R.*, 907 S.W.2d at 110; *see also In re C.G.*, 2005 Tex. App. LEXIS 3705, at *7; *Doyle v. Doyle*, 955 S.W.2d 478, 481 (Tex. App.—Austin 1997, no writ). In reviewing factual sufficiency, we consider and weigh all of the evidence, and if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust, we set aside the disposition order and remand the case for a new disposition hearing. *In re K.K.D.*, 2004 Tex. App. LEXIS 7166, at *7-8; *see In re C.C.*, 13 S.W.3d 854, 859 (Tex. App.—Austin 2000, no pet.);

6

*In re K.L.C.*, 972 S.W.2d 203, 206 (Tex. App.—Beaumont 1998, no pet.).  In deciding whether the evidence is legally sufficient, we view the evidence in the light most favorable to the finding and determine whether any rational trier of fact could have found that the elements of the requirement were proved beyond a reasonable doubt.[8]  *In re M.S.*, 940 S.W.2d at 791-92; *see In re K.K.D.*, 2004 Tex. App. LEXIS 7166, at *8.

**Legal and factual sufficiency**

The disposition order in this case states that C.F. would not accept parental supervision and has demonstrated a disregard for all authority.  That statement is supported by evidence of previous behavior that is included in the record.  The order also makes the required statutory findings, including a finding that the best interest of C.F. would be served by placing him outside the home.  In short, the final disposition order presents the court's determination that commitment to the TYC was in the best interest of C.F.  *See* Tex. Fam. Code Ann. § 54.04(I) (West Supp. 2004-05).

---

[8]  In his brief, C.F. relies heavily on a different standard applied by the San Antonio Court of Appeals.  *See In re E.T.*, No. 04-03-00796-CV, 2004 Tex. App. LEXIS 9929, at *4 (Tex. App.—San Antonio November 10, 2004, no pet.) (mem. op.); *In re K.T.*, 107 S.W.3d 65, 67 (Tex. App.—San Antonio 2003, no pet.).  The San Antonio court has rejected the legal and factual sufficiency standard, replacing it with a new standard requiring deference to the district court's findings of fact but a de novo determination of whether those facts justify the district court's disposition order in light of the purposes of the juvenile justice code.  *Id*.  We will continue to apply our legal and factual sufficiency standard in this case.  *See In re K.K.D.*, No. 03-03-00702-CV, 2004 Tex. App. LEXIS 7166, at *8 (Tex. App.—Austin August 12, 2004, pet. denied) (mem. op.); *In re M.C.L.*, 110 S.W.3d 591, 594 (Tex. App.—Austin, no pet.).

C.F. does not challenge language included in the disposition order signed by the district court. Instead, he challenges comments made by the referee at a hearing which occurred before the district court signed the disposition order. C.F. suggests that these comments reveal that the disposition order is based not on his best interests or other statutory requirements, but on concern with taxpayer burden. The district court's order, however, does not contain any hint of references that its recommendation was based on funding concerns.[9] Rather, in addition to other statutory findings not at issue on appeal, it finds that C.F. "was adjudged to have engaged in delinquent conduct for committing the offense of Assault on Public Servant (22.01) and that [C.F.] is in need of rehabilitation and that the protection of the public requires that disposition be made." Furthermore, all "reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for [C.F.] to return home." The district court then found that it would be in the best interest of C.F. to be committed to TYC.

We hold that the record includes factually and legally sufficient evidence to justify the disposition ordered in the final disposition order. *See In re J.R.*, 907 S.W.2d at 110. At the disposition hearing, C.F.'s juvenile probation officer testified regarding the large number of C.F.'s juvenile referrals, evidence of his previous unsuccessful placement at a residential treatment center and the various treatment programs offered by the TYC. Considering the testimony and evidence presented, the finding that C.F. should be committed to the TYC is not so against the great weight

---

[9] Additionally, in contrast to C.F.'s interpretation of the referee's comments, we believe that the more plausible interpretation is that the referee believed that the limited resources of county-funded programs would not allow for the long-term treatment necessary for C.F.'s successful rehabilitation.

and preponderance of the evidence as to be manifestly unjust. Additionally, the evidence of unsuccessful prior treatment and the possibility of rehabilitation at TYC would permit any rational trier of fact to find that the elements of the disposition requirements were proved beyond a reasonable doubt. Although Dr. Hamilton testified that she believed C.F. should be placed in a residential treatment center instead of at TYC, she admitted she was "not sure what the menu of options are right now." The court explained that "it's not necessarily a true dichotomy between TYC and residential treatment." The record contains extensive discussions at trial and questioning of Dr. Hamilton by the referee regarding the length of treatment necessary for C.F. to improve his behavior, and why treatment was unsuccessful in the past. We hold that the decision to commit C.F. to the TYC instead of to a residential treatment center was not an abuse of discretion. We overrule C.F.'s issue.

## CONCLUSION

Having overruled C.F.'s only issue, we affirm the order of the district court.

---

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: June 23, 2005

9